# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**

* * * * * * * * * * * * * * * * * * * * * *
MARIA CANDELL,                           *
                                         *       No. 11-729V
             Petitioner,                 *       Special Master Christian J. Moran
                                         *
v.                                       *       Filed: January 6, 2014
                                         *
SECRETARY OF HEALTH                      *       Findings of fact; hepatitis B
AND HUMAN SERVICES,                      *       vaccine; onset of shoulder
                                         *       pain.
             Respondent.                 *
* * * * * * * * * * * * * * * * * * * * * *

Diana Stadelnikas Sedar, Maglio Christopher and Toale, PA, Sarasota, FL, for petitioner;
Tara J. Kilfoyle, United States Dep't of Justice, Washington, DC, for respondent.

## FINDINGS OF FACT[*]

Maria Candell filed a petition under the National Childhood Vaccine Injury Act, 42 U.S.C. §300aa—10 et seq. (the "Vaccine Act" or "Act"), on November 3, 2011. In her petition, Ms. Candell alleged that the hepatitis B vaccinations she received caused her to suffer right arm and shoulder pain from brachial plexitis. Petition ("Pet.") at 3.

To support her claim for compensation, Ms. Candell filed medical records and affidavits. Some of the events recited in the affidavits, in particular those involving the onset of Ms. Candell's alleged injury, are not clearly represented in the contemporaneous medical records.

Ms. Candell received the hepatitis B vaccine on November 8, 2010, then again on December 6, 2010. The first record of a complaint of "shoulder pain"

---

[*] The E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899, 2913 (Dec. 17, 2002), requires that the Court post this decision on its website. Pursuant to Vaccine Rule 18(b), the parties have 14 days to file a motion proposing redaction of medical information or other information described in 42 U.S.C. § 300aa-12(d)(4). Any redactions ordered by the special master will appear in the document posted on the website.

occurred during Ms. Candell's appointment with Dr. Carmen Serrano-Lopez on March 25, 2011, where she described the pain starting one month earlier. For this reason (and other reasons discussed below), the Secretary maintains that Ms. Candell's shoulder pain began in January 2011. In contrast, Ms. Candell asserts, via affidavits and oral testimony, that her shoulder pain began in mid-December 2010.

When special masters are confronted with discrepancies among medical records and affidavits, special masters are encouraged to hold hearings to evaluate the testimony of the affiants. See Campbell v. Sec'y of Health & Human Servs., 69 Fed. Cl. 775, 779-80 (2006). A hearing was held on February 27, 2013, during which Ms. Candell and Mr. Thomas J. McCann appeared by videoconference, as permitted by Vaccine Rule 8(b)(2).[1] Following the hearing, the parties filed proposed findings of fact. With these submissions, findings of fact are ready to be made.

## Standard for Finding Facts

Petitioners are required to establish their cases by a preponderance of the evidence. 42 U.S.C. § 300aa–13(1)(a). The preponderance of the evidence standard requires a "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the judge of the fact's existence." Moberly v. Sec'y of Health & Human Servs., 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010) (citations omitted).

The process for finding facts in the Vaccine Program begins with analyzing the medical records, which are required to be filed shortly after the petition. 42 U.S.C. § 300aa–11(c)(2). Medical records that are created contemporaneously with the events that they describe are presumed to be accurate. Cucuras v. Sec'y of Health & Human Servs., 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Not only are medical records presumed to be accurate, they are also presumed to be complete, in the sense that the medical records present all the problems of the patient. Completeness is presumed due to a series of propositions. First, when people are ill, they see a medical professional. Second, when ill people see a doctor, they report all of their problems to the doctor. Third, having heard about the symptoms, the doctor records what he or she was told.

---

[1] Mr. McCann was sequestered during Ms. Candell's testimony.

Appellate authorities have accepted the reasoning supporting a presumption that medical records created contemporaneously with the events being described are accurate and complete.  A notable example is Cucuras, in which petitioners asserted that their daughter, Nicole, began having seizures within one day of receiving a vaccination.  Medical records created around that time, however, suggested that the seizures began at least one week after the vaccination.  Cucuras, 993 F.3d at 1527.  Affirming the special master's decision, a judge of the Court of Federal Claims stated that "[i]n light of [the parents'] concern for Nicole's treatment . . . it strains reason to conclude that petitioners would fail to accurately report the onset of their daughter's symptoms.  It is equally unlikely that pediatric neurologists, who are trained in taking medical histories concerning the onset of neurologically significant symptoms, would consistently but erroneously report the onset of seizures a week after they in fact occurred."  Cucuras v. Sec'y of Health & Human Servs., 26 Cl. Ct. 537, 543 (1992), aff'd, 993 F.2d 1525 (Fed. Cir. 1993).

Decisions from the Court of Federal Claims have followed Cucuras in affirming findings by special masters that the lack of contemporaneously created medical records can contradict a testimonial assertion that symptoms appeared on a certain date.  See, e.g., Doe/70 v. Sec'y of Health & Human Servs., 95 Fed. Cl. 598, 608 (Fed. Cl. 2010) ("Given the inconsistencies between petitioner's testimony and his contemporaneous medical records, the special master's decision to rely on petitioner's medical records was rational and consistent with applicable law."), aff'd sub nom. Rickett v. Sec'y of Health & Human Servs., 468 Fed. Appx. 952 (Fed. Cir. 2011) (non-precedential opinion); Doe/17 v. Sec'y of Health & Human Servs., 84 Fed. Cl. 691, 711 (2008); Ryman v. Sec'y of Health & Human Servs., 65 Fed. Cl. 35, 41-42 (2005); Snyder v. Sec'y of Health & Human Servs., 36 Fed. Cl. 461, 465 (1996) ("The special master apparently reasoned that, if Frank suffered such [developmental] losses immediately following the vaccination, it was more likely than not that this traumatic event, or his parents' mention of it, would have been noted by at least one of the medical record professionals who evaluated Frank during his life to date.  Finding Frank's medical history silent on his loss of developmental milestones, the special master questioned petitioner's memory of the events, not her sincerity."), aff'd, 117 F.3d 545, 547-48 (Fed. Cir. 1997).

The presumption that contemporaneously created medical records are accurate and complete, however, is rebuttable.  For cases alleging a condition found in the Vaccine Injury Table, special masters may find when a first symptom appeared, despite the lack of a notation in a contemporaneous medical record.  42 U.S.C. § 300aa-13(b)(2).  By extension, special masters may engage in similar

fact-finding in off-Table injury cases.  In such cases, special masters are expected to consider whether medical records are accurate and complete.

In determining the accuracy and completeness of medical records, special masters will consider various explanations for inconsistencies between contemporaneously created medical records and later given testimony.  Recently, the Court of Federal Claims listed four such explanations.  The Court noted that inconsistencies can be explained by: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist.  La Londe v. Sec'y Health & Human Servs., 110 Fed. Cl. 184, 203 (Fed. Cl. 2013).

In weighing divergent pieces of evidence, contemporaneous written medical records are usually ascribed more weight than oral testimony.  Cucuras, 993 F.2d at 1528.  Compelling oral testimony, however, may be more persuasive than written records.  Campbell, 69 Fed. Cl. at 779 (Fed. Cl. 2006) ("[L]ike any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking."); Camery v. Sec'y of Health & Human Servs., 42 Fed. Cl. 381, 391 (1998) (holding that this rule "should not be applied inflexibly, because medical records may be incomplete or inaccurate"); Murphy v. Sec'y of Health & Human Servs., 23 Cl. Ct. 726, 733 (1991), aff'd, 968 F.2d 1226 (Fed. Cir. 1992).

The relative strength or weakness of the testimony of a fact witness affects whether his or her testimony is more probative than medical records.  An assessment of a fact witness's credibility usually involves consideration of the person's demeanor while testifying.  Andreu v. Sec'y of Health & Human Servs., 569 F.3d 1367, 1379 (Fed. Cir. 2009); Bradley v. Sec'y of Health & Human Servs., 991 F.2d 1570, 1575 (Fed. Cir. 1993).

These criteria are considered in the analysis below.

## **Summary of Argument**

The parties dispute when Ms. Candell began to experience pain in her shoulder and arm. Ms. Candell asserts that her shoulder pain began in mid-December 2010, following her second dose of the hepatitis B vaccine. The Secretary contends that Ms. Candell's contemporaneous medical records do not indicate her shoulder pain began prior to January 2011. In support of her claim, Ms. Candell offered her own testimony and that of her domestic partner, Mr. Thomas McCann, to describe the events that followed her second hepatitis B vaccination on December 6, 2010.

## **Summary of Evidence**

Following the submission of her petition, Ms. Candell periodically filed affidavits and medical records (exhibits 1-29). A summary of the relevant documentary evidence and hearing testimony follows separately below.

   A. Documentary Evidence

In November 2010, Ms. Candell began working as a Certified Nursing Assistant ("CNA") with Halifax Health in Daytona Beach, Florida. Exhibit 25 at 1. On November 8, 2010, Ms. Candell received a dose of the hepatitis B vaccine as part of a Halifax Health "Post-Job Offer Medical History." Exhibit 15 at 1.

Ms. Candell received a second dose of the hepatitis B vaccine on December 6, 2010. Exhibit 15 at 3. On December 17, 2010, Ms. Candell sought treatment from Dr. Darwin Caraballo-Burgos at Ormond Medical Arts for sinus congestion, cough, chest congestion, fever, body aches, a sore throat, and headaches. Exhibit 13 at 4-6. Dr. Caraballo-Burgos conducted a physical exam and suggested that Ms. Candell suffered from an acute respiratory infection, asthma, acute bronchitis, and acute bronchospasm. Exhibit 13 at 6. He prescribed a Medrol dose pack, antibiotic, albuterol inhaler and nebulizer solution. Id. On December 27, 2010, Ms. Candell contacted Dr. Caraballo-Burgos to request a refill of antibiotics. Exhibit 13 at 7.

Ms. Candell was examined by Dr. Carmen Serrano-Lopez on March 25, 2011, for symptoms relating to an upper respiratory infection. Exhibit 4 at 7. During the examination, Ms. Candell reported having chest congestion since the previous December and pain in her right shoulder persisting for one month prior to the examination (placing onset around February 25, 2011). Exhibit 4 at 7. Dr.

5

Serrano-Lopez ordered diagnostic X-rays of Ms. Candell's right shoulder and prescribed an anti-inflammatory and physical therapy.  Id.

In the course of seeking treatment for her shoulder pain, Ms. Candell provided histories to her treating doctors indicating that during January 2011 she experienced pain, weakness, and loss of mobility.  See exhibit 14 at 14; exhibit 11 at 3; exhibit 8 at 3; exhibit 9 at 6. The details about Ms. Candell's histories relevant to the onset of her pain follow.

On April 18, 2011, Ms. Candell had an initial evaluation with an orthopedist, Dr. George Telesh.  Exhibit 14 at 14.  During this evaluation, Ms. Candell reported right shoulder pain starting three months prior to the visit (around January 18, 2011).  Id.  Dr. Telesh's assessment concluded that Ms. Candell suffered from tendinitis, bursitis and impingement syndrome.  Exhibit 14 at 16.  Ms. Candell was treated with a steroid injection and prescribed pain medication.  Id.  Ms. Candell saw Dr. Telesh again on May 2, 2011, and again reported that her shoulder pain began three months prior (around February 2, 2011).  Id. at 9.  Dr. Telesh ordered MRIs of Ms. Candell's shoulder and spine.  Id. at 13.  On May 4, 2011, Ms. Candell returned to Dr. Telesh's office to review the results of her MRI.  Id. at 3.  During this visit, Dr. Telesh determined Ms. Candell was a probable candidate for surgery and recommended her to Dr. Srinivasa Sridhar.  Id. at 7.

Ms. Candell received a third dose of the hepatitis B vaccination on May 9, 2011.  Exhibit 15 at 2.  The following day, Ms. Candell met with the orthopedist, Dr. Srinivasa Sridhar, for an initial evaluation and reported right shoulder pain lasting "four to five months," placing onset as either December 2010, or January 2011.  Exhibit 11 at 3.  Dr. Sridhar's assessment concluded that Ms. Candell suffered from a frozen shoulder from shoulder pain and that surgery was not indicated.  Id. at 2.  Dr. Sridhar recommended physical therapy.  Id.

On May 27, 2011, Ms. Candell was evaluated by another orthopedist, Dr. Richard Gaines at Halifax Orthopedic Clinic.  The chief complaint recorded for this evaluation was "right shoulder pain" with an injury date of January 1, 2011.  Exhibit 8 at 3.  By physical examination and review of Ms. Candell's May 2, 2011 MRI results, Dr. Gaines concluded that Ms. Candell suffered from a type III SLAP lesion of the right shoulder, cervical radiculopathy, and a frozen shoulder.  Ms. Candell was treated with a steroid injection and dose pack.  Dr. Gaines recommended physical therapy and referred Ms. Candell for a neurological consultation.

On June 2, 2011, Ms. Candell sought treatment from neurologist Dr. Olimpio Cunha, reporting right shoulder pain which began five months prior, around January 2, 2011, and gradually worsening. Exhibit 9 at 6. On June 3, 2011, Ms. Candell underwent an electromyogram ("EMG"), the results of which Dr. Cunha discussed with her that same day. Dr. Cunha reported his initial impression of Ms. Candell's pain as "either a mild brachial plexitis or an axillary neuropathy" and prescribed gabapentin and "light duty activities" due to "brachial plexitis." Exhibit 9 at 4; exhibit 23 at 18.

On December 22, 2011, Ms. Candell filed a petition for workers' compensation benefits indicating an injury date of December 6, 2010, the date of her second hepatitis B vaccine. Exhibit 27 at 146, 181. During a deposition in her workers' compensation case on February 13, 2012, Ms. Candell testified that her shoulder pain started in January 2011. Id. at 574.

B. Hearing Testimony

Ms. Candell testified that her job responsibilities as a CNA involved working with children, including lifting children as necessary in the course of taking vital records, as well as conducting patient interviews and recording their health histories. Transcript ("Tr.") 12-13, 61-63. Ms. Candell stated that she worked with two doctors, Dr. Thorpe and Dr. Carino, in addition to other nursing staff. Tr. 64. Ms. Candell recalled that when her pain began, she did not discuss it with her co-workers, including the doctors with whom she worked, because she did not want to "raise any red flags" or "alarm anyone." Tr. 81-83. Ms. Candell testified that she did not experience any symptoms after receiving the November 8, 2010 dose of hepatitis B vaccine. Tr. 13.

Ms. Candell stated that she began experiencing flu-like symptoms and shoulder pain in the week following her second vaccination on December 6, 2010. Tr. 13-14, 37. Ms. Candell stated that the shoulder pain and respiratory issues she experienced in mid-December 2010, were interfering with her activities of daily living and her ability to sleep. Tr. 15-18. Ms. Candell testified that she was unable to participate in holiday activities with her family as she had in previous Christmas seasons. Tr. 17-18.

Ms. Candell testified that the first opportunity she had to see a doctor after her pain began was on December 17, 2010, when she saw Dr. Caraballo-Burgos, and that by that date she was experiencing pain "down" her arm. Tr. 14, 37. Ms. Candell did not recall mentioning anything regarding her shoulder pain to Dr.

7

Caraballo-Burgos and that her main concern at that time, knowing she had asthma, was that she was having trouble breathing.  Id.  Ms. Candell described her asthma as "very well-controlled."  Id.  Ms. Candell recalled that following her visit to Dr. Caraballo-Burgos, she started to experience shoulder pain that inhibited her ability to do chores and to groom herself.  Tr. 15.  Mr. McCann also testified that Ms. Candell started struggling with day-to-day activities due to pain after her December 17, 2010 visit to Ormond Medical Arts. Tr. 120-21.

Ms. Candell averred that on the same day of her December 17, 2010 examination by Dr. Caraballo-Burgos, her mother arrived from Ft. Lauderdale to visit.  Tr. 15.  Ms. Candell explained that this visit was planned around December 9, 2010, as she was unable to drive to Ft. Lauderdale herself as she normally would for the holiday because she was sick and having pain.  Tr. 72.  Ms. Candell also recalled not being well enough to celebrate Mr. McCann's birthday, Christmas and New Year's that year.  Tr. 17-18, 83.  Mr. McCann also testified that Ms. Candell was unable to celebrate his December 22, 2010 birthday, and Christmas that same year, due to her pain.  Tr. 122-23.

Ms. Candell continued to work full-time throughout December 2010. Exhibit 29 at 1.  Ms. Candell testified that, although getting to work was a struggle, she continued to work out of financial necessity.  Tr. 18.  Mr. McCann testified that Ms. Candell continued to work because the family required more than one income for support. Tr. 122.

Ms. Candell testified that she first sought medical attention for her shoulder pain in March 2011, because of issues with insurance coverage and doctor availability.  Tr. 18-19.  Ms. Candell stated that she did not have insurance when she saw Dr. Caraballo-Burgos on December 17, 2010, and "had to wait 90 days" from the time she was hired in order to obtain health insurance coverage.  Tr. 19, 75.  Ms. Candell testified that she sought treatment as a new patient from Dr. Carmen Serrano-Lopez for shoulder pain and a sinus infection March 2011.  Tr. 19.

Ms. Candell testified that her pain gradually worsened over a period of time. Tr. 92-93, 97-98.  She confirmed that when testifying in her workers' compensation case, she reported her injury onset as January 2011. Tr. 44.  Ms. Candell additionally confirmed that she reported her injury onset to Dr. Sridhar and Dr. Gaines as January 2011.  Tr. 95, 103.  Ms. Candell testified that she did not know what "brachial plexitis" was prior to Dr. Cunha's June 2011 diagnosis.  Tr.

100. Following the diagnosis Ms. Candell says she began to research "brachial plexitis" and discovered it was connected to certain vaccinations.  <u>Id.</u>

### **The Secretary's Challenges**

The Secretary challenges several of Ms. Candell's assertions.  Specifically, she contests the assertions that:

1. Ms. Candell was "required" to receive the hepatitis B vaccinations by her employer;

1. Each of Ms. Candell's job and domestic responsibilities required physical strength, stamina, energy, fine motor skills, balance, good upper body strength, and mobility;

2. The onset of Ms. Candell's shoulder pain symptoms occurred in mid-December 2010 following her second hepatitis B vaccination;

3. Ms. Candell's asthma was well-controlled prior to her December 17, 2010 visit to Dr. Caraballo-Burgos;

4. Ms. Candell's and Mr. McCann's testimony accurately recounts Ms. Candell's condition following her second hepatitis B vaccine;

5. Ms. Candell experienced "remarkably significant signs" of right shoulder pain and impairment or "pain, weakness and loss of mobility, which were interfer[ing] with her activities of daily living and employment" in January 2011;

6. Ms. Candell received a diagnosis of brachial plexitis from Dr. Cunha on June 3, 2011; and

7. Ms. Candell continues to experience significant impairment and functional limitations with her right shoulder.

To each of these assertions the Secretary contends that the contemporaneous medical records do not support Ms. Candell's claims.

## Discussion

As discussed above, the inconsistency between Ms. Candell's contemporaneous medical records and a witness's testimony concerning symptoms can be explained in various ways. La Londe, 110 Fed. Cl. 203.  These explanations can be divided into two groups.  The first group ("group one") holds that the medical records are incomplete, either because a person failed to recount to the doctor everything that happened during the relevant time period, or because the doctor failed to record everything reported to her or him.  The second group ("group two") holds that the testimony offered is incorrect, either because a witness failed to recollect the events accurately, or because a witness fabricated a condition that did not exist.

In general, Ms. Candell does not dispute the accuracy of her medical records.[2]  Instead, Ms. Candell claims that she belongs to group one that she failed to recount the full spectrum of her symptoms to her treating physicians consistently.  This "incompleteness" of Ms. Candell's medical records is further complicated by a lack of records for a significant period of time during which Ms. Candell claims to have experienced symptoms of her injury.

Ms. Candell has provided testimony explaining the incompleteness of her medical records and describing the events surrounding mid-December 2010, following her second hepatitis B vaccination.   However, Ms. Candell's testimony does not persuasively clarify when she began having shoulder pain symptoms or why she did not seek contemporaneous treatment.  Given the multiple inconsistencies in Ms. Candell's testimony, it is apparent that her recollection may not be accurate, as characterized by group two.

Ms. Candell testified that she began experiencing flu-like symptoms with aches and shoulder pain within a week of receiving a second hepatitis B vaccine on December 6, 2010.  Tr. 13-14, 37.  Ms. Candell sought treatment from Dr. Caraballo-Burgos on December 17, 2010, for an acute respiratory infection and reported "body aches," but did not indicate any shoulder pain.  Exhibit 13 at 4.  Ms. Candell testified that she did not report her shoulder pain symptoms to Dr. Caraballo-Burgos because her respiratory issues were her primary concern at the time of the examination. Tr. 14, 37.

---

[2] Ms. Candell testified that she believed the onset date of 12/1/2010 recorded by Ability Health Services, Inc. on July 5, 2011 (exhibit 1 at 10) to be a mistake.  Tr. at 92-93.

10

On the day of her December 17, 2010 appointment with Dr. Caraballo-Burgos, Ms. Candell's mother arrived from Ft. Lauderdale on a visit arranged due specifically to her daughter's inability to drive to Ft. Lauderdale herself. Tr. 16-17. Ms. Candell claimed that, though she had historically visited her family in Ft. Lauderdale near Christmas, she was in too much pain to make the trip in 2010. Exhibit 25 at 1; tr. 16-17, 76-77. The arrival of Ms. Candell's mother on December 17, 2010, suggests that, if her visit were arranged to accommodate Ms. Candell's shoulder pain, it would have been arranged prior to that day. Ms. Candell testified to that effect, stating that the arrangement was made sometime the week prior. Tr. 70. It is unclear why, if Ms. Candell's shoulder pain were severe enough to cause her to alter her holiday plans, did she not report it to Dr. Caraballo-Burgos.

Ms. Candell's recollection seems further unclear considering that in her October 2012 affidavit she stated her right shoulder pain began after her December 17, 2010 appointment with Dr. Caraballo-Burgos, not before. Exhibit 25 at 1. The inconsistency between Ms. Candell's testimony and her October 2012 affidavit suggest that her recollection may be incomplete. Like Ms. Candell's description of events in her October 2012 affidavit, Mr. McCann testified that Ms. Candell experienced breathing issues at the time of her appointment with Dr. Caraballo-Burgos, and afterward started to struggle with dressing and lifting her arm. Tr. 120-21.

Ms. Candell testified that she contacted Dr. Caraballo-Burgos for a refill of antibiotics on December 27, 2010 and again did not report her shoulder pain. Tr. 39; exhibit 13 at 2. Ms. Candell did not receive further medical treatment until March 25, 2011, when she was examined as a new patient by Dr. Serrano-Lopez. Ms. Candell also did not discuss her pain with the Dr. Thorpe, the physician with whom she worked daily at the pediatric clinic. Tr. 80.

Ms. Candell testified that she paid out-of-pocket for her December 2010 visit to Dr. Caraballo-Burgos. Tr. 75. It would appear likely that, if Ms. Candell lacked insurance, she would have been motivated to avoid the added cost of seeking follow-up care, and would have reported her complete current problems, including shoulder pain, as comprehensively as possible during her December 2010 visit to Dr. Caraballo-Burgos. Further, Ms. Candell's training as a medical professional suggests she would have appreciated the importance of providing an accurate and complete medical history. Ms. Candell herself testified that, in the course of her employment, she conducted patient interviews and documented patient's reported health history information. Tr. 61-63.

Ms. Candell has provided two reasons for not seeking treatment for her shoulder pain prior to March 25, 2011, including lack of insurance coverage. Tr. 18-19. However, insurance actually was not an obstacle. Ms. Candell testified that she was unable to obtain health insurance coverage from her employer for ninety days after the start of her employment on November 22, 2010. Tr. 18-19. Accordingly, Ms. Candell would have been ineligible for insurance until late February of 2011. But, Ms. Candell's understanding of her enrollment is not accurate. She signed a Florida Health Care Plans "Group Health Employee Application Form" on December 10, 2010, and, when presented with a copy of her insurance card, Ms. Candell confirmed the effective date of her health insurance as January 1, 2011. Exhibit 23 at 22; exhibit 21 at 94; tr. 40.

In addition to a perceived lack of insurance, Ms. Candell further testified that she was unable to obtain an appointment with Dr. Serrano-Lopez earlier than March 25, 2011. Tr. 19. Although this may be true, Ms. Candell's explanation of why she did not seek treatment between December 17, 2010 and March 25, 2011, is not persuasive considering the pain she claims to have experienced during that time.

Ms. Candell testified that she sought care from Dr. Serrano-Lopez on March 25, 2011, because she "couldn't tolerate the pain in [her] right shoulder anymore." Exhibit 25 at 1. This urgency is not indicated in the contemporaneous medical records. The records from this examination report a "present illness" as that of an upper respiratory infection with symptoms similar to what Ms. Candell reported on December 17, 2010, to Dr. Caraballo-Burgos. Exhibit 4 at 7.

Although Ms. Candell reported her shoulder pain to Dr. Serrano-Lopez, no indication of the severity of the pain was recorded. Exhibit 4 at 7. Ms. Candell reported that she felt "poorly" and "tired". Id. "No acute distress" was noted during her physical exam. Id. Notably, Ms. Candell referred to her December 2010 respiratory infection when reporting her history to Dr. Serrano-Lopez, but reported a more narrow history of shoulder pain as persisting for only the month prior (around February 2011). Exhibit 4 at 7.

Ms. Candell repeatedly reported her shoulder pain as starting in January 2011. Following her treatment by Dr. Serrano-Lopez, Ms. Candell sought treatment from three separate orthopedists: Dr. Talesh, Dr. Sridhar and Dr. Gaines, as well as a neurologist, Dr. Cunha. Ms. Candell reported to each of these physicians that her pain started in January 2011. Exhibit 14 at 9, 14; exhibit 11 at

12

14; exhibit 10 at 3; exhibit 24 at 116; exhibit 9 at 6.  During her deposition in her workers' compensation case on February 13, 2012, Ms. Candell testified that her shoulder pain began in January 2011.  Exhibit 27 at 547, 574.  Ms. Candell acknowledged that, on multiple occasions, she reported her injury onset as January 2011, when providing her health history to her treating physicians and when testifying in her workers' compensation case.  Tr. 44, 91, 93, 95, 103.

     Ms. Candell's assertion that her right shoulder pain began in December 2010, after receiving her second hepatitis B vaccine does not comport with her previous reporting of her injury onset.  When asked why her current recollection differs, Ms. Candell stated that she has had more time to consider what events were occurring at the time.  Tr. 44.  Ms. Candell testified that she did not associate her shoulder pain with the vaccinations she received until Dr. Cunha introduced her to the term "brachial plexitis" in June 2011, which Ms. Candell later researched.  Tr. 100.  Although Ms. Candell has had more time to consider the events occurring around the onset of her shoulder pain, her current recollection does not persuasively clarify the time period between mid-December 2010 and March 2011.

     It is also unlikely that Ms. Candell's recollection about her shoulder condition in late 2010 and early 2011 would be better by the time of her 2013 testimony than in mid-2011 when she provided her treating doctors with histories.  Ms. Candell sought treatment from multiple providers over the course of several months and each asked her when her pain began.  Despite being asked to recollect the onset of her pain on multiple occasions, Ms. Candell often gave differing accounts.  Though sometimes reporting her pain beginning in February 2011, and once reporting it beginning in December 2010, Ms. Candell most frequently reported the onset as January 2011.  Exhibit 4 at 7; exhibit 11 at 3; exhibit 9 at 6; exhibit 14 at 9, 14.  It is unlikely that her ability to pinpoint the onset of her shoulder pain, which she was unable to do with consistency within months from the start of her pain, would improve years later.

     Ms. Candell's testimony was inconsistent in another respect as well.  Ms. Candell reported to Dr. Sridhar and Dr. Cunha that her shoulder pain onset was gradual.  Exhibit 11 at 3; exhibit 9 at 6.  Likewise, Ms. Candell testified that her pain gradually worsened over a period of time.  Tr. 92-93, 97-98.  However, she also claimed that by mid-December 2010, her shoulder pain was severe enough to alter her holiday plans and daily living.  Tr. 15-18.  This contradiction further indicates that Ms. Candell's recollection may be inaccurate.

The following findings of fact reflect the undersigned's determinations concerning the onset of Ms. Candell's condition. Those factual disputes not yet resolved are addressed below.

### **Findings of Fact**

Ms. Candell has proposed findings of fact to which the Secretary has responded. The disputed issues are resolved below.

2. Ms. Candell was "required" to receive the hepatitis B vaccinations by her employer.

It is clear that Ms. Candell received the hepatitis B vaccinations in connection with her employment. Exhibit 15 at 1. Whether Ms. Candell received the vaccinations because she elected to receive them or was required to receive them is less clear. Whether Ms. Candell's employer mandated vaccination as a condition of employment may be relevant to her workers' compensation benefit claim. But whether vaccinations were a condition of her employment appears not to be material to her claim for compensation in the Vaccine Program. Thus, no finding is made.

3. Each of Ms. Candell's job and domestic responsibilities required physical strength, stamina, energy, fine motor skills, balance, good upper body strength, and mobility.

The Secretary disputes the extent to which each of Ms. Candell's daily activities at home and work required the qualities described. Generally, Ms. Candell's assertions that her daily tasks required the use of her right arm, and at times heavy lifting, are supported in the record.

4. The onset of Ms. Candell's shoulder pain symptoms occurred in mid-December 2010, following her second hepatitis B vaccination; and

5. Ms. Candell's and Mr. McCann's testimony accurately recounts Ms. Candell's condition following her second hepatitis B vaccine.

This issue is the primary dispute between the parties. Ms. Candell asserts that her shoulder pain symptoms occurred in mid-December 2010, following her second hepatitis B vaccination. The Secretary argues that none of Ms. Candell's

contemporaneous medical records indicate her shoulder pain starting prior to January 2011.

For the reasons explained above, the Secretary's position is more persuasive as it is better supported by the evidence. Ms. Candell's oral testimony was not sufficiently persuasive to overcome her prior reporting, seen in multiple records, that her pain began in January 2011. While seeking treatment for her shoulder pain, Ms. Candell gave inconsistent histories of its onset, but most frequently reported her pain beginning in January 2011. The preponderance of the evidence supports a finding that Ms. Candell's shoulder pain began in January 2011, not in mid-December 2010.

6. Ms. Candell's asthma was well-controlled prior to her December 17, 2010, visit to Dr. Caraballo-Burgos.

It is apparent that Ms. Candell believed her asthma was well controlled because she did not require daily medication for it. Tr. 14. Citing her visit to the Emergency Department of Halifax Health on December 29, 2008, the Secretary argues that Ms. Candell has a history of requiring emergency treatment for her asthma. Exhibit 7 at 14; exhibit 21 at 3. Ms. Candell and Mr. McCann have testified to Ms. Candell's active lifestyle prior to her shoulder injury. Tr. 57-58; tr. 117-18. Participating in activities such as bike riding and tennis without daily asthma treatment suggests that "well-controlled" is a fair assessment of Ms. Candell's condition. Ms. Candell and Mr. McCann also testified that Ms. Candell's need for medical intervention for her asthma was intermittent. Tr. 1; tr. 117.

The record does not indicate what condition, if any, is generally accepted for as "well-controlled" asthma. Given that Ms. Candell sought treatment twice in the span of two years prior to December 2010, and did not take daily medication while remaining active, it is reasonable to describe her condition as "well-controlled."

7. Ms. Candell experienced "remarkably significant signs" of right shoulder pain and impairment or "pain, weakness and loss of mobility, which were interfer[ing] with her activities of daily living and employment" in January 2011.

As discussed above, the record does not support a finding that Ms. Candell experienced "remarkably significant signs" of right shoulder pain in January 2011. Ms. Candell testified, and reported to her treating physicians, that her pain came on

15

"gradually." Tr. 92-93, 97-98; exhibit 11 at 3; exhibit 9 at 6. None of Ms. Candell's treatment records reflect that her pain began abruptly. Indeed, when she sought treatment in March 2011, Ms. Candell's primary illness is recorded as symptoms of an upper respiratory infection. Exhibit 4 at 7.

Though Ms. Candell, on many occasions, reported her shoulder pain beginning in January 2011, at times she reported it as beginning February 2011. Exhibit 4 at 7; exhibit 14 at 9. While there are several examples in the record that Ms. Candell reported her symptoms beginning in January 2011, there is no basis for characterizing these reports as "remarkably significant signs." The record does not contain contemporaneous medical records from that period that describe the severity of her pain. The reports she provided to her treating physicians months later do not indicate severity either.

According to Ms. Candell's positive performance review and attendance records, there is no indication that her physical pain interfered with her employment. Exhibit 23 at 57-63; exhibit 29 at 1-2. Here, the record supports the Secretary's position that Ms. Candell did not experience shoulder pain that affected her life and employment to the extent characterized by petitioner's assertion. Instead, the record supports a finding that Ms. Candell began to experience a gradual onset of shoulder pain in January 2011.

8. Ms. Candell received a diagnosis of brachial plexitis from Dr. Cunha on June 3, 2011.

The record supports a finding that Ms. Candell received a diagnosis of brachial plexitis from Dr. Cunha on June 3, 2011. Although Dr. Cunha's impressions on June 3, 2011, include both brachial plexitis and axillary neuropathy, he provided Ms. Candell with a note prescribing "light duty" due to "brachial plexitis" that same day. Exhibit 9 at 4; exhibit 23 at 18. Dr. Cunha's reliance on the diagnosis of brachial plexitis, to the extent that he represented this as her diagnosis for the purposes of informing a third party, strongly supports a finding that on June 3, 2011, Ms. Candell was diagnosed with brachial plexitis.

9. Ms. Candell continues to experience significant impairment and functional limitations with her right shoulder.

Ms. Candell testified that her pain continues to affect her daily life. Tr. 105-06. However, the Secretary states that Ms. Candell's current medical records, beyond August 2012, are not available in the record to properly respond to this

assertion. Since the purpose was to establish facts regarding when Ms. Candell's shoulder pain began, it is not necessary to make any findings about Ms. Candell's shoulder pain currently.

## Conclusion

The parties are ordered to provide these findings of fact to any expert whom they retain to testify. A status conference will be held on **Thursday, January 23, 2014 at 2:30 P.M. Eastern Time**. Ms. Candell should be prepared to propose the next step in this case.

**IT IS SO ORDERED.**

s/Christian J. Moran
Christian J. Moran
Special Master